```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF OHIO
                   EASTERN DIVISION
```

LaToya D. Serban obo RDJ,      :

    Plaintiff,              :

  v.                             :     Case No.  2:14-cv-1770

                                         :     JUDGE GREGORY L. FROST
Commissioner of Social Security,     Magistrate Judge Kemp

    Defendant.              :

## REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiff, LaToya D. Serban, acting on behalf of R.D.J., a minor, filed this action seeking review of a decision of the Commissioner of Social Security denying R.D.J.'s application for supplemental security income.  That application was filed on June 28, 2011, and alleged that the minor child became disabled on August 30, 2009 (later amended to June 28, 2011).

After initial administrative denials of the claim, Plaintiff was given a video hearing before an Administrative Law Judge on January 29, 2013.  In a decision dated May 10, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on August 7, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on December 8, 2014.  Plaintiff filed her statement of specific errors on January 19, 2015, to which the Commissioner responded on February 8, 2015.  Plaintiff filed a reply brief on February 20, 2015, and the case is now ready to decide.

### II.  The Lay Testimony at the Administrative Hearing

Plaintiff, who is the claimant's mother, testified at the administrative hearing.  Her testimony appears at pages 43-64 of

the administrative record.

Plaintiff first stated that her son was being treated for ADHD, OCD, ODD, hypertension, slight autism, and sleep apnea. He was undergoing counseling both at home and at school and taking medication as well. At the time of the hearing, the child was in fourth grade.

Plaintiff was asked to describe a typical day in her son's life. She said that she had problems getting him to get out of bed or get dressed. He usually had attention issues at school. He would do homework and play video games after school, but apparently had some anger issues if he did not win at video games. If assigned a chore, he typically would not follow through, and the same was true with respect to taking his medications. He also had conflicts with Plaintiff's other two children and with others at his daycare center. Plaintiff also described difficulties which he had getting along with friends at school and the fact that he was receiving failing grades. He played sports but had anger and attention issues there as well.

There was some discussion about the treating doctor's notes, which appeared to show periods where the child did well, and periods of decline. Plaintiff testified that, to her understanding, her son would build up a tolerance to medications to the point where they would no longer be effective.

The claimant also testified, beginning at page 64. He said that he liked school and had friends there. He also was respectful to his teachers. However, he testified that he did not do homework and sometimes forgot to take his medicine.

### III. The Medical and Educational Records
#### A. Educational Records

The school records begin at page 222 of the record. They show that claimant did well up to the third grade except for some trouble with reading. He was in a reading recovery program in

first grade and had peer tutoring in second grade. A teacher questionnaire completed when he was halfway through the fourth grade showed that he had problems acquiring and using information, requiring instructions to be repeated and being tested in a private setting to avoid distractions; that he had obvious problems in carrying out multi-step instructions and completing work accurately; that his behavior was not a problem; that he could move and manipulate objects without difficulty; and that he could care for himself. He also became better focused after taking medication in the morning. At that time, he was earning Cs, Ds, or Fs in every class except writing, where he was earning an A.

Claimant's basketball coach wrote a note saying that the claimant would be a good player if he could remember the plays but took his anger out on others when he forgot. His daycare provider said that he could not function when not taking his medication, that he did not comprehend orders, and that he was always talkative and active. He also threw long tantrums when he did not like what he was told to do and he sleep-walked.

In February, 2013, claimant was placed on a 504 plan at school due to ADHD and medication. The plan called for him to be in a small group setting for testing, to have directions and test questions read aloud, to be given extra time for testing, and to be allowed to take frequent breaks. (Tr. 615-16).

B. Records Concerning ADHD

The first medical record about ADHD is a report from Dr. Noor dated January 24, 2013. At that time, claimant was described as "[T]aking medication ok. No problems in school. No problems sleeping. Appetite is good. Mother doesn't think new medication is working yet." (Tr. 272). Dr. Noor also said that claimant's condition had been improving but he still had problems sitting still and had anger issues. Dr. Noor wrote a note saying

that medication adjustments had been made due to uncontrolled ADHD.

Dr. Noor had also filled out a questionnaire prior to the administrative hearing on which he stated that Plaintiff had several areas of marked impairment, including age-appropriate communicative/cognitive functioning and social functioning, and an extreme limitation in attending to and completing tasks. He also said that claimant had only a mild impairment in concentration, persistence, and pace, however. He indicated claimant suffered from severe impulsiveness and extreme hyperactivity and exhibited a number of symptoms related to paying attention to detail, sustaining attention, completing tasks, and being easily distracted. According to Dr. Noor, claimant had been doing well until recently when his initial symptoms returned, which necessitated the change in medications. (Tr. 601-03). In a note dated February 7, 2013, he explained that questionnaire further, saying that the claimant had a markedly limited impairment in his ability to attend and complete tasks and that his ADHD was not controlled with medication. Dr. Noor also said that claimant had only become symptomatic again in the last two months and they were in the process of dose adjustment with the new medication. (Tr. 275).

There are a number of additional office notes from Dr. Noor. Those which pre-date the 2013 questionnaire show that claimant was generally doing well. There are also some notes which post-date the ALJ's decision, and they also show that claimant's ADHD was well-controlled, with the exception of an October, 2013 note indicating that claimant had difficulty focusing, and a November, 2013 note to the same effect. A December, 2013 note described claimant's condition as mostly well-controlled.

A counselor's report from 2011 indicates that claimant had a short attention span, was cooperative with the therapist, did not

-4-

respond well to criticism, was easily distracted, and had some cognitive delays.  However, he was slowly making progress.  (Tr. 322-25).

The record also contains a number of notes from the therapist who saw the claimant at home.  A note from February, 2012, indicated that claimant's medications were working and that claimant generally did well in maintaining appropriate behavior although at times he was angry that the session interrupted some other activity.  Occasionally, he needed redirection to stay on task.  A note from April, 2012, said that claimant had brought home a good report card, and another from that same month indicated that his medications had stabilized him and he was now able to focus.  A June, 2012 note described him as "doing well," and other notes made that same month and the next month reported that his mother said his behavior had been good.  In August, he returned to school, and did well initially, participating in football as well as academics.  Notes of much the same content appear in the October and November, saying also that school staff were reporting no behavioral or academic problems.  He began playing basketball after football ended.  Even into January of 2013, no problems were reported other than minor bickering with siblings.  (Tr. 399-528).

Finally, as part of the reconsideration process, Dr. Goorey reviewed the records as of January 12, 2012, and concluded that claimant was not disabled, noting that his condition did not meet the severity requirements for child's SSI benefits.  Dr. Tangeman had reached a similar conclusion upon initial review of the claim.  (Tr. 74, 85-87).

        C.   <u>Records Concerning Visual Impairment</u>

Claimant was examined by Thomas Green, O.D., when claimant was seven.  He had 20/20 vision in his right eye but had amblyopia and 20/400 vision in the left eye at distance and

-5-

20/300 for reading.  (Tr. 303-06).  The amblyopia diagnosis was apparently made when claimant was three (Tr. 346).  Glasses were prescribed when claimant was four (the treatment note says that the doctor could not get claimant to wear an eye patch).  He was seen from time to time because his glasses were broken.  When he was in third grade, his acuity (unaided) in the left eye was 20/800, but the note does not indicate what it was when corrected.  (Tr. 382).  There do not appear to be any other records concerning this impairment, and it is not mentioned in any of the other treatment notes or in any school records.  Both state agency physicians concluded, based on Dr. Green's records, that claimant had a severe physical impairment which they described as loss of visual acuity or blindness and low vision.  Dr. Goorey considered this impairment under six different sections of the Listing of Impairments but found that it did not meet any of those Listings.  (Tr. 82-87).

    IV. <u>The Administrative Law Judge's Decision</u>

 The Administrative Law Judge's decision appears at pages 21-34 of the administrative record.  The important findings in that decision are as follows.

 The Administrative Law Judge found, first, that the claimant was a pre-schooler on the date his application was filed and a school-age child at the time of the hearing.  Next, he found that claimant had one severe impairment, namely ADHD.

 In a child's disability case, the Listing of Impairments governs whether the child is entitled to benefits.  The ALJ found that claimant's ADHD did not, at any time, meet or functionally equal the requirements of any section of the Listing (20 C.F.R. Part 404, Subpart P, Appendix 1).  He evaluated the level of impairment in the six pertinent domains (acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects,

caring for oneself, and health and physical well-being), and found only one marked impairment, that being in the area of attending and completing tasks. At least two marked limitations or one extreme limitation are needed to satisfy the Listing. Consequently, the ALJ concluded that claimant was not entitled to benefits.

V. <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises two issues. First, she asserts that the ALJ erred by not finding that claimant had a severe visual impairment. Second, she asserts the ALJ erred by not according controlling weight to Dr. Noor's opinion. These assertions are evaluated under the following standard.

<u>Standard of Review</u>. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" <u>Id</u>. <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human</u>

-7-

Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Visual Impairment

Plaintiff argues, first, that the ALJ should have found that claimant had a severe visual impairment. She claims that claimant is "essentially, completely blind in his left eye" and that the ALJ had no basis for concluding otherwise. She points to the fact that both state agency reviewers also considered his visual impairment to be severe, and argues that a consultative examination should have been ordered on this issue. In response, the Commissioner argues that the ALJ both considered the effect of this impairment when he reviewed claimant's functioning in the domain of health and physical well-being and that the absence of a finding that it independently met any section of the Listing meant that it was not a disabling condition. Plaintiff's reply asserts that while the state agency physicians apparently took this impairment into account in their evaluation of claimant's health and did not find that he had a marked impairment in that area, the one additional record they did not have - showing a decline in uncorrected vision in the left eye to 20/800 - "might" have affected their opinions. (Doc. 15, at 4).

As this Court has stated,

> The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of SSI benefits:
>
> 1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.
>
> 2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

-8-

> 3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P., Appendix 1? If so, benefits are granted.

Dorn v. Comm'r of Social Security, 2015 WL 502142, *1 (S.D. Ohio Feb. 5, 2015), adopted and affirmed 2015 WL 1020180 (S.D. Ohio March 9, 2015). As this Court has also noted,

> Generally, a child's impairment is of "listing-level severity" if it causes marked limitations in two domains of functioning or an extreme limitation in one as described in 20 C.F.R. § 416.926a(a). 20 C.F.R. § 416.925(b)(2)(h).
>
> Similarly, to functionally equal an impairment in the Listing, an impairment must result in "marked" limitations in two domains of functioning by which functional limitations are evaluated or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a. The six domains by which functional limitations are evaluated are: i) acquiring and using information; ii) attending and completing tasks; iii) interacting and relating with others; iv) moving about and manipulating objects; v) caring for oneself; and vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Relevant factors that will be considered in making this evaluation are (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) how the child is affected by his medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

Tennyson v. Comm'r of Social Security, 2011 WL 1124761, *2-3 (S.D. Ohio March 4, 2011), adopted and affirmed 2011 WL 1119645 (S.D.Ohio March 24, 2011). The significance of this statutory and regulatory scheme to Plaintiff's first claim of error is this: even if claimant's amblyopia should have been viewed as a severe impairment, any error in that regard is harmless if there is no basis for believing that it was so severe that it met or functionally equaled a visual impairment described in the

-9-

Listing.  And, in that regard, it is important to note that the ALJ did give this impairment some (albeit very brief) consideration in his step three analysis by noting that the claimant wore glasses.  Usually, any error in not finding a particular impairment to be severe is rendered harmless by the ALJ's later consideration of the effects of that impairment when deciding if a claimant has satisfied some section of the Listing. See Tucker v. Colvin, 2015 WL 4645747 (S.D. Ala. Aug. 5, 2015).

    Assuming Plaintiff's arguments to be both that the ALJ erred in not finding claimant's amblyopia to be a severe impairment and erred in assessing its severity, the Court concludes that any such error was harmless.  There is no evidence in the record from which someone could conclude that claimant had any specific limitations in his full field of vision.  His mother's testimony did not suggest that, nor did any of the medical records.  He was able to function in school without any accommodations to a vision problem and to play sports like football, basketball, and baseball which require a level of visual acuity.  The only treatment ever provided to him for a vision issue was glasses. The state agency reviewers had the records before them, and neither found that the vision impairment, by itself, was severe enough to meet or equal any section of the Listing, or that it affected claimant in the domain of physical health to the extent that he had a marked impairment in that domain.  The suggestion that the one additional record showing a decrease in uncorrected visual acuity in the left eye would have caused the reviewers to reach a different conclusion is simply speculation, and is not supported with reference to any language in the Listing suggesting that the difference is a significant one.  Under these circumstances, although it clearly would have been better for the ALJ to devote more discussion to the vision issue, his failure to find that is was a severe impairment had no effect on the outcome of the case and is therefore harmless.

B.  <u>Treating Physician</u>

Plaintiff's second claim of error relates to the ALJ's decision not to accord controlling weight to the January, 2013 opinion of Dr. Noor, which reflected, at least at that time, that claimant had enough marked or extreme limitations to qualify for benefits.  It is always helpful to begin an analysis of this type of claim by examining what the ALJ said in support of his decision.

The ALJ, after conducting an extensive review of Dr. Noor's treatment notes (Tr. 26-27), and pointing out that most of these notes showed that claimant's ADHD was relatively well-controlled and that his grades, family relationships, and friendships were improving, gave little weight to the January, 2013 opinion because Dr. Noor's "statements are contrary to the medical record and his own treatment notes." (Tr. 27).  He also observed that Dr. Noor had been able successfully to adjust the claimant's medication in order to control his symptoms of ADHD.  The ALJ did, however, accept Dr. Noor's opinion that claimant had a marked limitation in the area of attending and completing tasks, but he did not credit the opinion that a similar limitation existed in the area of social functioning.  The ALJ went on to assess claimant's functioning in the six pertinent areas, relying on the medical records, notes from teachers, and the opinions of the state agency reviewers.  Plaintiff asserts that this rationale is inadequate because the evidence of uncontrolled ADHD and marked limitations in several domains of functioning is "overwhelming." Doc. 13, at 13.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(c); <u>see also Lashley</u> v. <u>Secretary of H.H.S.</u>, 708 F.2d 1048, 1054 (6th Cir. 1983); <u>Estes v. Harris</u>, 512 F.Supp. 1106,

-11-

1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

    Here, the ALJ adequately articulated his reasons for not accepting the January, 2013 opinion, in full, and Plaintiff does not argue otherwise.  Consequently, the only question for the Court is whether the record supports the ALJ's reasoning.  For the following reasons, the Court finds that it does.

    A fair reading of Dr. Noor's notes, the extensive notes from the home counselor, and the educational records shows that, for the most part, the claimant was able to function reasonably well despite his ADHD.  He was not in special classes at school and had decent grades, although they did drop when, in late 2012, he stopped responding to the medication he was taking at that time. He was able to participate in sports and, notwithstanding the one statement from his basketball coach, appeared to do so successfully.  Most of the time, his mother or other caregivers reported that he was not having behavioral problems of any note. Dr. Noor's opinion was rendered at a time when, contrary to

almost every other time Dr. Noor saw claimant, his ADHD was not well-controlled.  Dr. Noor responded by changing medication, and there is nothing in the record to support the proposition that this change was not successful in restoring some level of control to claimant's ADHD.  Thus, it is true that the majority of the treatment notes both from Dr. Noor and others do not support such extreme limitations, and it was appropriate for the ALJ to give that particular opinion little weight on some issues.

Certainly, there is evidence in the record to support Plaintiff's claim of a disability, but it can not fairly be described as overwhelming.  Rather, the evidence presents a picture of a child who has a serious impairment but who has been treated fairly successfully and who is able to engage in those activities expected of a child of his age.  The ALJ did not find that he was completely successful, and did find one marked limitation as well as several others which were present but less than marked.  That is an interpretation of the record which a reasonable person was permitted to make, and it is not this Court's function to substitute its reasoning for that of the ALJ when the ALJ's decision has substantial support in the record. See Collins v. Comm'r of Social Security, 2008 WL 2302695, *6 (S.D. Ohio May 30, 2008) (when reasons given for discounting opinion of treating source are supported by the record, the decision to discount that opinion are within the ALJ's "'zone of choice'").  Consequently, the Court finds no merit in Plaintiff's second claim of error.

## VI.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner of Social Security.

## VII.  Procedure on Objections

If any party objects to this Report and Recommendation,

that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

     The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                    /s/ Terence P. Kemp
                                    United States Magistrate Judge